FILED

2014 JUN 12  PM 4: 33

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2014 Grand Jury **CR 14 00083**

| UNITED STATES OF AMERICA, | No. SA CR 14- |
|---|---|
| Plaintiff, | I N D I C T M E N T |
| v. | [21 U.S.C. § 846: Conspiracy to Manufacture, Possess with Intent to Distribute, and Distribute Controlled Substance Analogues; 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Controlled Substance Analogues; 18 U.S.C. § 371: Conspiracy to Enter and Introduce into the Commerce of the United States, Imported Merchandise, By Means of False Statements and to Smuggle Merchandise Through Fraudulent Documents; 18 U.S.C. § 922(g): Felon in Possession of Firearms and Ammunition; 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i), and 1957: Money Laundering; 18 U.S.C. § 2: Aiding and Abetting and Causing Act to Be Done; 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853: Criminal Forfeiture] |
| SEAN LIBBERT,<br>KYLE KLEDZIK,<br>JIN LIU,<br>  aka "Thomas Lau,"<br>  aka "Tom Lau,"<br>FNU LNU,<br>  aka "Simon,"<br>FNU LNU,<br>  aka "Wu," and<br>FNU LNU,<br>  aka "Andrew Zhang,"<br><br>        Defendants. | |

The Grand Jury charges:

COUNT ONE

[21 U.S.C. § 846]

A.    GENERAL ALLEGATIONS

1.    The Controlled Substances Analogue Enforcement Act of 1986 (hereinafter, the "Analogue Act") makes unlawful the manufacture, dispensing, and possession of controlled substance analogues.  A controlled substance analogue is a substance which is substantially similar to the chemical structure of a Schedule I or Schedule II controlled substance and which has either a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than that of the chemically analogous Schedule I or Schedule II controlled substance, or is represented or intended to have such an effect.  A controlled substance analogue intended for human consumption is treated as a Schedule I controlled substance for purposes of the Controlled Substances Act.

2.    Since February 22, 1988, 3,4-methylenedioxy-N-methylamphetamine (hereinafter, "MDMA" or "ecstasy") has been classified as a Schedule I controlled substance which has a stimulant and hallucinogenic effect on the central nervous system.  Several analogues of MDMA exist.  The synthetic cathinones 3,4-methylenedioxymethcathinone (hereinafter, "methylone") and 4-methylenedioxypyrovalerone (hereinafter, "MDPV") are two such analogues of MDMA and belong to the group of substances commonly  referred to as "bath salts."

3.    Since October 15, 1993, 2-(methylamino)propiophenone (hereinafter, "methcathinone") has been classified as a Schedule I controlled substance which has a stimulant and hallucinogenic

1 effect on the central nervous system.  The synthetic cathinone

2 4-methyl-N-ethylcathinone (hereinafter, "4-MEC") is an analogue

3 of methcathinone and belongs to the group of substances commonly

4 referred to as "bath salts."

5     4.   Since April 4, 2003, 5-methoxy-N,N-

6 diisopropyltryptamine (hereinafter, "5-MeO-DIPT") has been

7 classified as a Schedule I controlled substance which has a

8 stimulant and hallucinogenic effect on the central nervous

9 system.  The synthetic cathinone 5-methoxy-N,N-diallyltryptamine

10 (hereinafter "5-MeO-DALT") is an analogue of 5-MeO-DIPT and

11 belongs to the group of substances commonly referred to as "bath

12 salts."

13     5.   Since March 1, 2011, 1-pentyl-3-(1-naphthoyl)indole

14 (hereinafter, "JWH-018") has been classified as a Schedule I

15 controlled substance which has a depressant and hallucinogenic

16 effect on the central nervous system.  JWH-018 is a synthetic

17 form of marijuana, also referred to as a synthetic cannabinoid.

18 The synthetic cannabinoids 1-(5-fluoropentyl)-3-(1-

19 naphthoyl)indole (hereinafter, "AM-2201"), 1-[(N-

20 methylpiperidin-2-yl)methyl]-3-(2-iodobenzoyl)indole

21 (hereinafter, "AM-2233"), 1-[(N-methylpiperidin-2-yl)methyl]-3-

22 (adaMant-1-oyl)indole (hereinafter, "AM-1248"), 1-(5-

23 fluoropentyl)-3-(2-iodobenzoyl)indole (hereinafter "AM-694"), 1-

24 [(1-methylpiperidin-2-yl)methyl]-3-(1-naphthoyl)indole

25 (hereinafter, "AM-1220") and 1-pentyl-3-(4-methyl-1-

26 naphthoyl)indole (hereinafter, "JWH-122"), 1-pentyl-3-(2-

27 methoxyphenylacetyl)indole (hereinafter, "JWH-250"), 1-pentyl-3-

28 (4-methoxy-1-naphthoyl)indole (hereinafter, "JWH-081"), 1-

1  pentyl-3-(4-ethyl-1-naphthoyl)indole (hereinafter, "JWH-210"),

2  1-pentyl-3-(2-chlorophenylacetyl)indole (hereinafter "JWH-203"),

3  1-pentyl-3-(2,2,3,3-tetramethylcyclopropyl)indole (hereinafter,

4  "UR-144"), and 1-[2-(4-morpholinyl)ethyl]-1H-indol-3-

5  yl](2,2,3,3-tetramethylcyclopropyl)-methanone (hereinafter,

6  "A,796,260") are among the analogues of JWH-018.  As analogues

7  of JWH-018, synthetic cannabinoids, separately and in

8  combination, can be mixed with agents, such as acetone, to

9  generate a mixture that is sprayed onto plant material, such as

10  marshmallow leaf or damania leaf, to create synthetic marijuana

11  (commonly referred to as "spice" or "herbal incense").  Such

12  synthetic marijuana is smoked or orally ingested.

13  B.   OBJECTS OF THE CONSPIRACY

14       Beginning on or about March 1, 2011, and continuing to

15  approximately on or about July 25, 2012, in Orange County,

16  within the Central District of California, and elsewhere,

17  defendants SEAN LIBBERT ("LIBBERT") and KYLE KLEDZIK

18  ("KLEDZIK"), co-conspirators Craig Neil ("Neil"), Jeremy

19  Jennings ("Jennings"), and Gabriel Afana ("Afana"), and others

20  known and unknown to the Grand Jury, conspired and agreed with

21  each other to knowingly and intentionally (1) manufacture, (2)

22  possess with intent to distribute, and (3) distribute:

23            (a)   mixtures and substances containing detectable

24       amounts of methylone and MDPV, which are Schedule I

25       controlled substance analogues, as defined in Title 21,

26       United States Code, Section 802(32)(A), of MDMA, knowing

27       that the substances were intended for human consumption, as

28       provided in Title 21, United States Code, Section 813, in

1    violation of Title 21, United States Code, Sections

2    841(a)(1) and (b)(1)(C);

3         (b)  mixtures and substances containing detectable

4    amounts of 4-MEC, which is a Schedule I controlled

5    substance analogue, as defined in Title 21, United States

6    Code, Section 802(32)(A), of methcathinone, knowing that

7    the substances were intended for human consumption, as

8    provided in Title 21, United States Code, Section 813, in

9    violation of Title 21, United States Code, Sections

10   841(a)(1) and (b)(1)(C); and

11        (c)  mixtures and substances containing detectable

12   amounts of AM-2201, AM-2233, AM-1248, AM-694, AM-1220, JWH-

13   250, JWH-081, JWH-210, JWH-203, UR-144, JWH-122, and

14   A,796,260, each a Schedule I controlled substance analogue,

15   as defined in Title 21, United States Code, Section

16   802(32)(A), of JWH-018, knowing that each of the substances

17   was intended for human consumption, as provided in Title

18   21, United States Code, Section 813, in violation of Title

19   21, United States Code, Sections 841(a)(1) and (b)(1)(C).

20   C.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

21        ACCOMPLISHED

22        The objects of the conspiracy were to be accomplished in

23   substance as follows:

24        1.   Defendant LIBBERT, a United States citizen residing in

25   Orange County, California, would purchase analogues of JWH-018,

26   methcathinone, and MDMA, including AM-2201, AM-2233, AM-1248,

27   AM-694, AM-1220, JWH-250, JWH-081, JWH-210, JWH-203, UR-144,

28   JWH-122, and A,796,260, 4-MEC, methylone, and MDPV, from

5

1   international and domestic manufacturers-suppliers for the

2   purpose of resale and usage in the manufacture of synthetic

3   marijuana for human consumption.

4        2.   Defendant LIBBERT would sell controlled substance

5   analogues to others, including co-conspirator Afana, who would

6   then create synthetic marijuana for sale.

7        3.   Defendant LIBBERT would sell controlled substance

8   analogues under the company name, RCS Labs, Inc., and through

9   drug websites, including ResearchChemicalSupplier.com and

10  RCSChemicals.com.

11       4.   Defendant LIBBERT and co-conspirator Neil would hire

12  and teach co-conspirator Jennings how to create synthetic

13  marijuana using JWH-018 in order to manufacture, market, and

14  sell synthetic marijuana for human consumption, and would

15  "front" to co-conspirator Jennings analogues of JWH-018,

16  specifically AM-2201, AM-694, JWH-250, JWH-210, and JWH-081, for

17  use in the manufacture of synthetic marijuana.

18       5.   Defendant LIBBERT would hire and instruct defendant

19  KLEDZIK how to process orders of controlled substance analogues

20  from drug customers made over Internet website "stores" and the

21  RCS Labs, Inc. customer service telephone number.

22       6.   Defendant KLEDZIK would pick up from private mailboxes

23  located in the Central District of California, which had been

24  previously opened by defendant LIBBERT and co-conspirator Neil,

25  packages of controlled substance analogues that defendant

26  LIBBERT had purchased from international and domestic suppliers.

27       7.   Defendant KLEDZIK and defendant LIBBERT would fill and

28  package orders of controlled substance analogues from drug

1    customers, including customer C.G., and aid and abet each other

2    in the mailing of such packages to these drug customers.

3        8.   Co-conspirators Neil and Jennings would run a company

4    named "SC Distribution LLC" ("SC Distribution") used for the

5    purpose of marketing and selling synthetic marijuana for human

6    consumption, which defendant LIBBERT and co-conspirator NEIL

7    would fund.

8        9.   Defendant LIBBERT would routinely meet with co-

9    conspirator Jennings to receive weekly profits from SC

10   Distribution's sales of synthetic marijuana and, if necessary,

11   to either directly "front" or request defendant KLEDZIK to

12   "front" additional AM-2201, AM-694, JWH-081, JWH-250, and/or

13   JWH-210 to co-conspirator Jennings to be used to manufacture

14   additional synthetic marijuana for sale and human consumption.

15       10.  Between on or about March 10, 2011 and on or about

16   October 13, 2011, co-conspirator Jennings and his employees

17   would generate approximately $368,871.10 arising out of the

18   sales of synthetic marijuana, the total of which minus

19   commission payments for co-conspirator Jennings and his sales

20   force, constituted profits for defendant LIBBERT, who would

21   split such profits with co-conspirator Neil until on or about

22   May 5, 2011, when co-conspirator Neil left the business.

23       11.  Between on or about March 1, 2011 and on or about May

24   24, 2012, defendant LIBBERT would pay defendant KLEDZIK

25   approximately $75,000 for services defendant KLEDZIK provided to

26   defendant LIBBERT's controlled substance analogue trafficking

27   business.

28

D.    OVERT ACTS

    In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the following dates, defendants LIBBERT and KLEDZIK, and co-conspirators Neil, Jennings, and Afana, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

    1.   On March 9, 2011, defendant LIBBERT ordered five kilograms of AM-2201, two kilograms of JWH-081, three kilograms of JWH-210, three kilograms of JWH-203, one kilogram of methylone, and one kilogram of MDPV from a domestic manufacturer-supplier, unindicted co-conspirator A.R. ("co-conspirator A.R.").

    2.   On March 9, 2011, defendant LIBBERT caused a wire transfer of $56,750 to be made to co-conspirator A.R. from Wells Fargo Bank Account xxxx4709 ("Bank Account xxxx4709").

    3.   On March 9, 2011, defendant LIBBERT caused a wire transfer of $56,750 to be made to co-conspirator A.R. from Wells Fargo Bank Account xxxx7175 ("Bank Account xxxx7175").

    4.   On March 17, 2011, in an electronic mail message, co-conspirator Jennings provided defendant LIBBERT, co-conspirator Neil, and an unindicted co-conspirator ("UCC #1") with a summary of SC Distribution's March 11, 2011 weekly sales totals and the commissions earned by co-conspirator Jennings and his employees from the sales of synthetic marijuana under the brand name "Da Kine Blend," including that $1,597 was to be paid to co-conspirator Jennings.

5.   On March 17, 2011, co-conspirator Neil and UCC #1 issued a check from SC Distribution's Bank of America Account xxxx9860 ("SC Distribution's Bank Account") to co-conspirator Jennings in the amount of $1,597.

6.   On March 29, 2011, using coded language in an electronic mail message, co-conspirator Neil informed defendant LIBBERT and UCC #1 that a customer's controlled substance analogues order had not been filled and processed because the customer's $19,800 deposit to purchase these controlled substance analogues had bounced.

7.   On March 29, 2011, in an electronic mail message, co-conspirator Neil informed defendant LIBBERT and UCC #1 that checks issued to defendant LIBBERT and co-conspirator Neil in the amount of $40,000 to $50,000 each would be sufficient until other checks could be issued the following week.

8.   On March 31, 2011, in an electronic mail message, defendant LIBBERT discussed with co-conspirators Neil and Jennings and UCC #1 the tax ramifications relating to the 1099s of SC Distribution's employees.

9.   On March 31, 2011, in an electronic mail message, co-conspirator Jennings provided defendant LIBBERT, co-conspirator Neil, and UCC #1 with a summary of SC Distribution's March 25, 2011 weekly sales totals and the commissions earned by co-conspirator Jennings and his employees arising out of the sale of synthetic marijuana under the brand name "Da Kine Blend," including that $3,026 was to be paid to one of co-conspirator Jennings' sales employees.

10.   On March 31, 2011, co-conspirator Neil and UCC #1

issued a check from SC Distribution's Bank Account in the amount of $3,026 to one of co-conspirator Jennings' sales employees.

11.  On April 1, 2011, in an electronic mail message, co-conspirator Jennings informed an unindicted co-conspirator ("UCC #2") that he had met with his investors and that they wanted UCC #2 to market the different synthetic marijuana product lines under the brand name "Da Kine Blend" through a "store blitz" to 250 retail stores located outside of California.

12.  On April 1, 2011, in an electronic mail message, co-conspirator Jennings informed defendant LIBBERT, co-conspirator Neil, and UCC #1 that he had deposited $5,935 into S.C. Distribution's Bank Account, which was a portion of the $12,450 that SC Distribution had collected from the sale of synthetic marijuana that day.

13.  On April 7, 2011, in an electronic mail message, co-conspirator Jennings provided defendant LIBBERT, co-conspirator Neil, and UCC #1 with a summary of SC Distribution's April 1, 2011 weekly sales totals and the commissions arising out of the sale of synthetic marijuana under the brand name "Da Kine Blend," including that $1,328 was to be paid to one of co-conspirator Jennings' sales employees.

14.  On April 7, 2011, co-conspirator Neil and UCC #1 issued a check from SC Distribution's Bank Account to one of co-conspirator Jennings' sales employees in the amount of $1,328.

15.  On April 11, 2011, in an electronic mail message, co-conspirator Jennings provided defendant LIBBERT, co-conspirator Neil, and UCC #1 with an invoice for the cost of marketing the "store blitz" of synthetic marijuana to 250 retail stores and

1 | asked UCC #2 to pay the invoice.

2 |     16.  On April 13, 2011, co-conspirator Neil ordered 4,850

3 | "Blueberry Extreme" small labels for the purpose of labeling

4 | some of the synthetic marijuana being sold through SC

5 | Distribution.

6 |     17.  On April 15, 2011, co-conspirator Neil ordered 1,207

7 | "Blueberry Extreme" large labels for the purpose of labeling

8 | some of the synthetic marijuana being sold through SC

9 | Distribution.

10 |     18.  On April 21, 2011, in an electronic mail message,

11 | defendant LIBBERT discussed with co-conspirator Neil and UCC #1

12 | the hours worked and the hourly rate earned by defendant

13 | LIBBERT's employees, including defendant KLEDZIK, so that UCC #1

14 | could issue checks to the employees and balance the books of the

15 | business.

16 |     19.  On April 21, 2011, in an electronic mail message, co-

17 | conspirator Neil confirmed with defendant LIBBERT and UCC #1

18 | that he would obtain cashier's checks in the amount of $40,000

19 | to pay himself and defendant LIBBERT their share of SC

20 | Distribution's profits.

21 |     20.  On April 21, 2011, in an electronic mail message, co-

22 | conspirator Jennings provided defendant LIBBERT, co-conspirator

23 | Neil, and UCC #1 with a summary of SC Distribution's April 15,

24 | 2011 weekly sales totals and the commissions earned by co-

25 | conspirator Jennings and his employees arising out of the sale

26 | of synthetic marijuana under the brand name "Da Kine Blend,"

27 | including that $2,648 was to be paid to co-conspirator Jennings

28 | and that $1,500 was to be paid to one of co-conspirator

1  Jennings' sales employees.

2      21.  On April 21, 2011, co-conspirator Neil and UCC #1

3  issued a check from SC Distribution's Bank Account to co-

4  conspirator Jennings in the amount of $2,648 and a check to an

5  SC Distribution sales employee in the amount of $1,500.

6      22.  On April 28, 2011, in an electronic mail message,

7  defendant LIBBERT discussed with co-conspirator Neil and UCC #1

8  the need to be careful and to not issue commission checks based

9  on sales from credit card transactions not yet finalized in

10  light of the "sensitivity" of banks with respect to insufficient

11  accounts and bad checks.

12      23.  On April 28, 2011, in an electronic mail message, co-

13  conspirator Jennings provided defendant LIBBERT, co-conspirator

14  Neil, and UCC #1 with a summary of SC Distribution's April 22,

15  2011 weekly sales totals and the commissions earned by co-

16  conspirator Jennings and his employees arising out of the sale

17  of synthetic marijuana under the brand name "Da Kine Blend,"

18  including that $3,101 was to be paid to co-conspirator Jennings.

19      24.  On April 28, 2011, co-conspirator Neil and UCC #1

20  issued a check from SC Distribution's Bank Account to co-

21  conspirator Jennings in the amount of $3,101.

22      25.  On April 30, 2011, defendants LIBBERT and KLEDZIK

23  mailed approximately four grams of a mixture and substance

24  containing a detectable amount of JWH-250 to a drug customer in

25  Tavares, Florida, in response to an order placed on or about

26  April 30, 2011.

27      26.  On May 5, 2011, in an electronic mail message,

28  defendant LIBBERT asked co-conspirator Jennings whether co-

conspirator Jennings wanted to get into the business of trafficking in "bath salts" because it was the "same customers, twice the cash."

27.   On May 5, 2011, in an electronic mail message, defendant LIBBERT told co-conspirator Jennings that they should order 250 pounds of marshmallow leaf and asked co-conspirator Jennings where a check should be sent to fund this purchase.

28.   On May 6, 2011, in an electronic mail message, co-conspirator Jennings provided defendant LIBBERT and UCC #1 with an invoice evidencing a purchase of 125 kilograms of marshmallow leaf and requested that UCC #1 tell him when the payment would be deposited or wired to the supplier of this marshmallow leaf.

29.   On May 9, 2011, co-conspirator Jennings caused a wire transfer in the amount of $3,562.50 to be sent to the "Keys of Paradise" marshmallow leaf supplier from SC Distribution's Bank Account.

30.   On May 9, 2011, in an electronic mail message, co-conspirator Jennings informed defendant LIBBERT and UCC #1 that he had wired the purchase payment directly to the marshmallow leaf supplier.

31.   On May 26, 2011, in an electronic mail message, co-conspirator Jennings informed defendant LIBBERT that he had been to defendant LIBBERT's office to drop off profits from the sales of synthetic marijuana but that he had left because the office was locked, and co-conspirator Jennings told defendant LIBBERT that he planned on depositing the money in the bank instead.

32.   On June 2, 2011, in an electronic mail message, co-conspirator Jennings told defendant LIBBERT that he would leave

the weekly profits from SC Distribution's sale of synthetic marijuana at defendant LIBBERT's office while defendant LIBBERT was in Beijing, China.

33. On June 16, 2011, using coded language in an electronic mail message, co-conspirator Jennings informed defendant LIBBERT that he was heading to defendant LIBBERT's office in Orange County, California, and co-conspirator Jennings requested that defendant LIBBERT have 110 grams of JWH-250, 110 grams of JWH-210, and 110 grams of JWH-081 ready for co-conspirator Jennings to pick up.

34. On June 23, 2011, defendant LIBBERT ordered two kilograms of JWH-018 from co-conspirator A.R.

35. On June 23, 2011, defendant LIBBERT caused a wire transfer of $9,600 to be made to co-conspirator A.R. from Wells Fargo Bank Account xxxx7292 ("Bank Account xxxx7292").

36. On June 24, 2011, defendant LIBBERT ordered one kilogram of 4-MEC from co-conspirator A.R.

37. On June 24, 2011, defendant LIBBERT caused a wire transfer of $3,200 to be made to co-conspirator A.R. from Bank Account xxxx7292.

38. On June 29, 2011, in an electronic mail message, co-conspirator Jennings asked defendant LIBBERT about the availability of AM-694.

39. On June 29, 2011, in an electronic mail message, defendant LIBBERT informed co-conspirator Jennings that he would have AM-694 available in five days.

40. On July 6, 2011, defendant LIBBERT ordered one kilogram of JWH-210 and one kilogram of JWH-122 from co-

1    conspirator A.R.

2         41.   On July 6, 2011, defendant LIBBERT caused a wire

3    transfer of $8,000 to be made to co-conspirator A.R. from Bank

4    Account xxxx7292.

5         42.   On July 15, 2011, defendant LIBBERT ordered four

6    kilograms of AM-2201 and two kilograms of JWH-210 from co-

7    conspirator A.R.

8         43.   On July 15, 2011, defendant LIBBERT caused a wire

9    transfer of $26,500 to be made to co-conspirator A.R. from Bank

10   Account xxxx7292.

11        44.   On July 21, 2011, defendants LIBBERT and KLEDZIK

12   mailed approximately 2.2 grams of a mixture and substance

13   containing a detectable amount of AM-2201 to a drug customer

14   located in Brandon, Florida, in response to an order placed on

15   or about July 21, 2011.

16        45.   On July 27, 2011, defendant LIBBERT ordered two

17   kilograms of methylone, two kilograms of JWH-203, one kilogram

18   of JWH-122, and one kilogram of AM-2201 from co-conspirator A.R.

19        46.   On July 27, 2011, defendant LIBBERT caused a wire

20   transfer of $21,000 to be made to co-conspirator A.R. from Bank

21   Account xxxx7292.

22        47.   On August 10, 2011, in a series of electronic mail

23   messages, defendant LIBBERT agreed to meet with co-conspirator

24   Afana the following day so that defendant LIBBERT could provide

25   co-conspirator Afana with 300 grams of JWH-122 and 60 grams of

26   AM-2201.

27        48.   On August 26, 2011, defendants LIBBERT and KLEDZIK

28   mailed approximately 2.2 grams of a mixture and substance

containing a detectable amount of AM-2201 to a drug customer located in San Jose, California, in response to an order placed on or about August 16, 2011.

49. On August 22, 2011, defendants LIBBERT and KLEDZIK mailed approximately four grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Artesia, New Mexico, in response to an order placed on or about August 19, 2011.

50. On August 26, 2011, defendants LIBBERT and KLEDZIK mailed approximately two grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in San Jose, New Mexico, in response to an order placed on or about August 16, 2011.

51. On September 6, 2011, defendants LIBBERT and KLEDZIK mailed approximately 50.5 grams of a mixture and substance containing a detectable amount of JWH-122 to a drug customer located in Coeur d'Alene, Idaho, in response to an order placed on or about September 3, 2011.

52. On September 6, 2011, defendants LIBBERT and KLEDZIK mailed approximately 1.1 grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Fairbanks, Alaska, in response to an order placed on or about September 2, 2011.

53. On September 8, 2011, defendants LIBBERT and KLEDZIK mailed approximately 1.1 grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Covington, Virginia, in response to an order placed on or about September 7, 2011.

1    54.  On September 8, 2011, defendants LIBBERT and KLEDZIK
2  mailed approximately one gram of a mixture and substance
3  containing a detectable amount of AM-2233 to a drug customer
4  located in Covington, Virginia, in response to an order placed
5  on or about September 7, 2011.

6    55.  On September 8, 2011, defendants LIBBERT and KLEDZIK
7  mailed approximately one gram of a mixture and substance
8  containing a detectable amount of AM-1220 to a drug customer
9  located in Covington, Virginia, in response to an order placed
10  on or about September 7, 2011.

11    56.  On September 14, 2011, defendants LIBBERT and KLEDZIK
12  mailed approximately 50.5 grams of a mixture and substance
13  containing a detectable amount of JWH-122 to a drug customer
14  located in Coeur d'Alene, Idaho, in response to an order placed
15  on or about September 3, 2011.

16    57.  On October 7, 2011, defendants LIBBERT and KLEDZIK
17  mailed approximately 32.4 grams of a mixture and substance
18  containing a detectable amount of 4-MEC to a drug customer
19  located in Carrollton, Georgia, in response to an order placed
20  on or about October 7, 2011.

21    58.  On October 7, 2011, in an electronic mail message,
22  defendant KLEDZIK informed defendant LIBBERT that he had taken
23  two kilograms of 4-MEC out of the safe to give to a drug
24  customer and that he had put a note on the inventory sheet for
25  defendant LIBBERT's attention.

26    59.  On October 18, 2011, using coded language in an
27  electronic mail message, defendant LIBBERT informed co-
28  conspirator Jennings that he had shut down the company and that

1  the chemicals used to manufacture synthetic marijuana were

2  locked in a storage unit.

3       60.   On October 18, 2011, using coded language in an

4  electronic mail message, co-conspirator Jennings asked defendant

5  LIBBERT if defendant LIBBERT would provide him with one-half a

6  kilogram of each analogue chemical used to manufacture synthetic

7  marijuana and told defendant LIBBERT that co-conspirator

8  Jennings would make weekly payments to defendant LIBBERT from

9  the profits made as a result of selling the synthetic marijuana

10  manufactured from these chemical analogues.

11       61.   On October 18, 2011, using coded language in an

12  electronic mail message, defendant LIBBERT informed co-

13  conspirator Jennings that he had sold everything, but that he

14  would keep co-conspirator Jennings' order.

15       62.   On October 21, 2011, in an electronic mail message,

16  defendant KLEDZIK stated to defendant LIBBERT, "Nice!  New

17  product lines.  All Cannys?" in reference to RCS Lab Inc.'s new

18  stock of controlled substance analogues.

19       63.   On November 3, 2011, defendant LIBBERT ordered three

20  kilograms of AM-1248 from co-conspirator A.R.

21       64.   On November 4, 2011, defendant LIBBERT ordered four

22  kilograms of AM-2201 from co-conspirator A.R.

23       65.   On November 4, 2011, defendant LIBBERT caused a wire

24  transfer of $34,000 to be made to co-conspirator A.R. from Bank

25  Account xxxx7292.

26       66.   On November 11, 2011, defendant LIBBERT forwarded a

27  "Payment Transaction Failed Reminder" electronic mail message

28  regarding a one gram order of AM-1248 in the amount of $38.87

1  from a drug customer to defendant KLEDZIK, and instructed
2  defendant KLEDZIK to process the order by phone.

3       67.  On November 15, 2011, in an electronic mail message,
4  defendant LIBBERT informed defendant KLEDZIK that he had
5  received a deposit of $2,000 from a drug customer for an order
6  of controlled substance analogues.

7       68.  On November 15, 2011, in an electronic mail message,
8  defendant KLEDZIK informed defendant LIBBERT that he was
9  processing an online drug order in the amount of $1,000.

10       69.  On November 22, 2011, defendant KLEDZIK informed
11  defendant LIBBERT that he had made arrangements for a FedEx box
12  to be picked up at the Camino Del Avion private mailbox.

13       70.  On November 22, 2011, in an electronic mail message,
14  defendant LIBBERT instructed defendant KLEDZIK to give a drug
15  customer store credit because the drug customer complained about
16  the alleged inefficacy of 5-MeO-DALT purchased from RCS Lab's
17  online website store.

18       71.  On November 22, 2011, defendants LIBBERT and KLEDZIK
19  mailed approximately 18.2 grams of a mixture and substance
20  containing a detectable amount of JWH-081 to a drug customer
21  located in Staten Island, New York, in response to an order
22  placed on or about November 22, 2011.

23       72.  On December 1, 2011, using coded language in an
24  electronic mail message, defendant LIBBERT instructed defendant
25  KLEDZIK to retrieve three kilograms of JWH-122 from a private
26  mailbox and wait for defendant LIBBERT's approval before
27  shipping it to a drug customer.

28       73.  On December 1, 2011, using coded language in an

1  electronic mail message, defendant LIBBERT confirmed with

2  defendant KLEDZIK that defendant KLEDZIK should send an

3  unindicted co-conspirator to retrieve the shipment of JWH-122

4  and that defendant KLEDZIK should ship the three kilograms of

5  JWH-122 to a drug customer.

6       74.   On December 1, 2011, in an electronic mail message,

7  defendant KLEDZIK informed defendant LIBBERT that he was getting

8  a lot of sales from drug customers he had e-mailed and texted.

9       75.   On December 6, 2011, defendants LIBBERT and KLEDZIK

10  mailed approximately six grams of a mixture and substance

11  containing a detectable amount of AM-2201 to a drug customer,

12  C.G., who subsequently ingested the drugs and suffered serious

13  bodily injury.

14       76.   On December 6, 2011, defendant LIBBERT ordered four

15  kilograms of AM-2201 from co-conspirator A.R.

16       77.   On December 6, 2011, defendant LIBBERT caused a wire

17  transfer of $16,000 to be made to co-conspirator A.R. from Bank

18  Account xxxx7292.

19       78.   On December 8, 2011, defendants LIBBERT and KLEDZIK

20  mailed approximately 32.4 grams of a mixture and substance

21  containing a detectable amount of AM-2201 and approximately 50.4

22  grams of a mixture and substance containing a detectable amount

23  of AM-2201 to a drug customer located in Waukegan, Illinois, in

24  response to an order placed on or about December 8, 2011.

25       79.   On December 8, 2011, in an electronic mail, defendant

26  KLEDZIK reminded defendant LIBBERT that 950 grams of AM-694 was

27  scheduled to arrive at one of the private mailboxes that day and

28  that they also owed a drug customer some AM-2201.

80. On December 16, 2011, defendant LIBBERT ordered two kilograms of AM-2201 from co-conspirator A.R.

81. On December 16, 2011, defendant LIBBERT caused a wire transfer of $8,000 to be made to co-conspirator A.R. from Bank Account xxxx7292.

82. On December 21, 2011, defendants LIBBERT and KLEDZIK mailed approximately 4.1 grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Pendleton, Oregon, in response to an order placed on or about December 21, 2011.

83. On December 21, 2011, defendants LIBBERT and KLEDZIK mailed approximately nine grams of a mixture and substance containing a detectable amount of 5-MeO-DALT to a drug customer located in Pendleton, Oregon, in response to an order placed on or about December 21, 2011.

84. On January 10, 2012, defendant LIBBERT ordered one kilogram of AM-2201 from co-conspirator A.R.

85. On January 10, 2012, defendant LIBBERT caused a wire transfer of $8,000 to be made to co-conspirator A.R. from Bank Account xxxx7292.

86. On January 11, 2012, in a series of electronic mail messages, defendant LIBBERT confirmed that he would fill co-conspirator Afana's order of 175 grams of JWH-122 and 40 grams of AM-2201 by overnight mail and instructed co-conspirator Afana to pay for the order through a deposit in RCS Labs, Inc.'s Bank Account xxxx7292.

87. On January 11, 2012, in an electronic mail message, co-conspirator Afana told defendant LIBBERT that he needed an

additional 900 grams of JWH-122 and another 180 grams of AM-2201, asked what the total price would be for these analogue drugs, and inquired when he could meet defendant LIBBERT the next day to pick-up his order.

88.  On January 11, 2012, using coded language in an electronic mail message, defendant LIBBERT told co-conspirator Afana that the price for JWH-122 would be $6.50 per gram and that the price for AM-2201 never changed.

89.  On January 11, 2012, in an electronic mail message, co-conspirator Afana told defendant LIBBERT that it was always $6 per gram for orders in excess of one kilogram and observed that he "got almost 1.1 KG today."

90.  On January 12, 2012, an undercover law enforcement agent posing as a buyer of controlled substance analogues (the "UC") ordered 32 grams of JWH-081 and two grams of AM-2201 from defendant LIBBERT's online drug website, "www.rcschemicals.com."

91.  On January 13, 2012, defendants LIBBERT and KLEDZIK mailed approximately 31.9 grams of a mixture and substance containing a detectable amount of JWH-081 and approximately 2.1 grams of AM-2201 to the UC.

92.  On January 23, 2012, defendants LIBBERT and KLEDZIK mailed approximately 1.2 grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Augusta, Georgia, in response to an order placed on or about January 21, 2012.

93.  On February 7, 2012, in a series of electronic mail messages, co-conspirator Afana ordered from defendant LIBBERT 725 grams of JWH-122 and 155 grams of AM-2201.

94. On February 8, 2012, in an electronic mail message, co-conspirator Afana told defendant LIBBERT that he needed to pick up his order as soon as possible.

95. On February 8, 2012, in a series of electronic mail messages, defendant LIBBERT and co-conspirator Afana agreed to meet the following day so that co-conspirator Afana could pick up his order and pay defendant LIBBERT.

96. On February 9, 2012, in a series of electronic mail messages, defendant LIBBERT and co-conspirator Afana agreed to meet in Orange County, California, so that co-conspirator Afana could pick up the controlled substance analogues from defendant LIBBERT.

97. On February 15, 2012, defendants LIBBERT and KLEDZIK mailed approximately 4.1 grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Alexandria, Virginia, in response to an order placed on or about February 15, 2012.

98. On March 13, 2012, defendant LIBBERT ordered five kilograms of AM-2201 from co-conspirator A.R.

99. On March 13, 2012, defendant LIBBERT caused a wire transfer of $20,000 to be made to co-conspirator A.R. from Wells Fargo Bank Account xxxx5232 ("Bank Account xxxx5232").

100. On March 15, 2012, defendant LIBBERT ordered three kilograms of UR-144 from co-conspirator A.R.

101. On March 15, 2012, defendant LIBBERT caused a wire transfer of $13,500 to be made to co-conspirator A.R. from Bank Account xxxx5232.

102. On April 2, 2012, defendants LIBBERT and KLEDZIK

mailed approximately 1.1 grams of a mixture and substance containing a detectable amount of AM-2201 to a drug customer located in Tucson, Arizona, in response to an order placed on or about March 31, 2012.

103. On May 17, 2012, defendant LIBBERT ordered three kilograms of AM-2201 from co-conspirator A.R.

104. On May 17, 2012, defendant LIBBERT caused a wire transfer of $12,000 to be made to co-conspirator A.R. from Bank Account xxxx5232.

COUNT TWO

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about December 6, 2011, in Orange County, within the Central District of California, and elsewhere, defendants SEAN LIBBERT and KYLE KLEDZIK, each aiding and abetting the other, knowingly and intentionally distributed for human consumption a mixture and substance containing a detectable amount of 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (hereinafter, "AM-2201") to C.G., knowing that AM-2201 was a controlled substance analogue and which substance was, in fact, a controlled substance analogue of 1-pentyl-3-(1-naphthoyl)indole (hereinafter, "JWH-018"), a Schedule I controlled substance, and C.G.'s serious bodily injury resulted from the use of this mixture and substance.

COUNT THREE

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about January 13, 2012, in Orange County, within the Central District of California, defendants SEAN LIBBERT and KYLE KLEDZIK, each aiding and abetting the other, knowingly and intentionally distributed for human consumption approximately 31.9 grams of a mixture and substance containing a detectable amount of 1-pentyl-3-(4-methoxy-1-naphthoyl)indole (hereinafter, "JWH-081") knowing that JWH-081 was a controlled substance analogue and which substance was, in fact, a controlled substance analogue of 1-pentyl-3-(1-naphthoyl)indole (hereinafter, "JWH-018"), a Schedule I controlled substance.

COUNT FOUR

[21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a)]

On or about January 13, 2012, in Orange County, within the Central District of California, defendants SEAN LIBBERT and KYLE KLEDZIK, each aiding and abetting the other, knowingly and intentionally distributed for human consumption approximately 2.1 grams of a mixture and substance containing a detectable amount of 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (hereinafter, "AM-2201") intended for human consumption, knowing that AM-2201 was a controlled substance analogue and which substance was, in fact, a controlled substance analogue of 1-pentyl-3-(1-naphthoyl)indole (hereinafter, "JWH-018"), a Schedule I controlled substance.

COUNT FIVE

[18 U.S.C. § 371]

A.   GENERAL ALLEGATIONS

1.   Paragraphs One through Five of the General Allegations set forth in Count One, Section A are re-alleged and incorporated by reference as if fully set forth herein.

2.   The United States Customs and Border Protection ("CBP") is a federal law enforcement agency of the United States Department of Homeland Security charged with regulating and facilitating international trade, assessing and collecting import duties, and enforcing United States regulations, including regulations related to trade, customs, and immigration.  CBP has the authority to search outbound and inbound shipments of goods crossing the United States border. Under Section 596 of the Tariff Act (19 U.S.C. § 1595A(c)), CBP is required to seize and forfeit all merchandize that is stolen, smuggled, or clandestinely imported or introduced into the United States.  CBP is also required to seize and forfeit controlled substances and other contraband articles that enter or exit the United States.

3.   To properly and accurately assess and collect duties and to ensure that contraband and other prohibited items are not introduced into the United States, CBP relies upon the filing of entry documents for merchandise crossing the United States border, including merchandise transported through the mail delivery system.  When a shipment of foreign goods reaches the United States, the importer or consignee typically must file entry documents for the merchandise, which provide specific

1   information relating to the imported goods, such as an accurate

2   description of the merchandise, the sales price of the

3   merchandise, the terms of sale, and all costs and services

4   determined by law to be dutiable.  Entry documents may include

5   documents such as invoices, visas, a packing list, a bill of

6   lading, and CBP forms.

7   B.   OBJECTS OF THE CONSPIRACY

8        Beginning on an unknown date and continuing through on or

9   about July 25, 2012, in Orange County, within the Central

10  District of California, and elsewhere, defendants SEAN LIBBERT

11  ("LIBBERT"); JIN LIU, also known as ("aka") "Thomas Lau," aka

12  "Tom Lau" ("LIU"); First Name Unknown ("FNU") Last Name Unknown

13  ("LNU"), aka "Simon" ("SIMON"); FNU LNU, aka "Wu" ("WU"); and

14  FNU LNU, aka "Andrew Zhang" ("ZHANG"), and others known and

15  unknown to the Grand Jury, knowingly combined, conspired, and

16  agreed to the following offenses against the United States:

17       1.   To enter and introduce into the commerce of the United

18  States imported merchandise, namely, chemical products, which,

19  after March 1, 2011, constituted controlled substance analogues,

20  by means of false statements and by means of false and

21  fraudulent invoices, declarations, affidavits, and certain other

22  papers, namely, shipping and product packaging and labels, which

23  were false and fraudulent in that they misrepresented the nature

24  of, and severely devalued, the chemical products, in violation

25  of Title 18, United States Code, Section 542; and

26       2.   To knowingly and willfully, with intent to defraud the

27  United States, make out and pass through the customhouse any

28  false, forged, or fraudulent invoice, or other document or

1  paper, in violation of Title 18, United States Code, Section

2  545.

3  C.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

4       ACCOMPLISHED

5       The objects of the conspiracy were to be accomplished in

6  substance as follows:

7       1.   Defendant LIBBERT would purchase chemical products,

8  including chemical products that constituted controlled

9  substance analogues after March 1, 2011 ("chemical products")

10 from Chinese manufacturers-suppliers, such as defendants LIU,

11 SIMON, WU, and ZHANG.

12      2.   Defendant LIBBERT and co-conspirator Craig Neil

13 ("Neil") would incorporate businesses, open private mailboxes,

14 and open multiple bank accounts to facilitate the smuggling of

15 chemical products from China into the United States.

16      3.   Defendant LIBBERT would instruct an unindicted co-

17 conspirator to create false shipping and product labels and

18 false product invoices, which would be transmitted to Chinese

19 manufacturers-suppliers for use in the packaging and shipping of

20 chemical products into the United States.

21      4.   Defendant LIBBERT would transmit false labels and

22 invoices to Chinese manufacturers-suppliers to be used in the

23 packaging and shipping of chemical products for the purpose of

24 evading the payment of customs dues and/or the scrutiny of

25 customs officials regarding the actual contents and value of

26 such packages entering the United States in order to avoid their

27 seizure.

28      5.   Defendant LIBBERT would travel to China to secure

Chinese manufacturers-suppliers of chemical products and to train the Chinese manufacturers-suppliers on smuggling and importing the products into the United States using false and fraudulent packaging, labels, and invoices.

6.    Defendants LIU, SIMON, WU, and ZHANG (collectively, the "Chinese manufacturers-suppliers") would use companies located in China to manufacture, supply, smuggle, and import into the United States chemical products, using false and fraudulent documents, including mislabeled shipping and product packaging and invoices that undervalued the chemical products at issue.

7.    The Chinese manufacturers-suppliers would fill orders placed by defendant LIBBERT for chemical products and send such products to United States-based private mailbox addresses provided by defendant LIBBERT, using false packaging, labels, and invoices which were either given to them by defendant LIBBERT or they themselves created using defendant LIBBERT's samples and instructions.

8.    Defendant SIMON would send chemical products to defendant LIBBERT, who had either purchased them or who would, pursuant to an agreement with defendant SIMON, keep a stock of such products in his warehouse in the United States to facilitate shipping them to defendant SIMON's drug customers.

9.    Between on or about March 1, 2010 and on or about June 5, 2012, defendant LIBBERT and his co-conspirators would smuggle and import into the United States approximately 300 kilograms of chemical products at a cost of approximately $1.4 million, using false shipping and product labels and invoices.

10.   Between on or about August 17, 2011 and on or about February 27, 2012, defendant LIBBERT and his co-conspirators would utilize bank accounts to pay defendant LIU at least approximately $52,000 for chemical products that were shipped to defendant LIBBERT using false shipping and product labels and invoices.

D.   OVERT ACTS

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the dates listed below, defendants LIBBERT, LIU, SIMON, WU, and ZHANG, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

1.   On February 10, 2010, co-conspirator Neil incorporated Bonsai Enterprises as a California corporation.

2.   On February 10, 2010, defendant LIBBERT incorporated Diamond Runners LLC as a California corporation.

3.   On March 5, 2010, co-conspirator Neil opened a private mailbox at The UPS Store, located at 1001 Avenida Pico, Suite C, in San Clemente, California, in the name of co-conspirator Neil (the "Avenida Pico Suite Mailbox").

4.   On March 6, 2010, defendant LIBBERT opened a private mailbox at The Mailroom, located at 24040 Camino Del Avion, Suite A, Box #333, in Monarch Beach, California, in the business names of "Diamond Runners," "JWH018Supplier.com," "Elle Ryan Capital Group," "Bonsai Enterprises," and "Core West Funding" (the "Camino Del Avion Mailbox").

5.   On March 18, 2010, co-conspirator Neil opened Bank of

America account xxxx9632 ("Bank Account xxxx9632") in the name of "Bonsai Enterprises, Inc."

6. On March 24, 2010, defendant LIBBERT incorporated Diamond Runners LLC as a Wyoming corporation.

7. On April 2, 2010, defendant LIBBERT opened Wells Fargo Bank account xxxx4709 ("Bank Account xxxx4709") in the name of "Diamond Runners Inc."

8. On July 6, 2010, defendant LIBBERT incorporated RCS Labs Inc. as a California corporation.

9. On December 22, 2010, co-conspirator Neil opened a private mailbox at The Shipping Outlet, located at 63 Via Pico Plaza, Box #141, in San Clemente, California, in the business name of "RCS Labs, Inc." (the "Via Pico Plaza Mailbox").

10. On January 26, 2011, defendant LIBBERT opened Bank of America account xxxx3849 ("Bank Account xxxx3849") in the name of "RCS Labs, Inc.," with defendant LIBBERT and co-conspirator Neil as signatories.

11. On March 3, 2011, defendant LIBBERT and co-conspirator Neil caused a wire transfer in the amount of $67,100 to be made from Bank Account xxxx3849 to defendant WU's company in China.

12. On March 4, 2011, defendant LIBBERT and co-conspirator Neil traveled from Los Angeles, California, to Hong Kong, China, and met with defendant WU to discuss the ordering and smuggling of chemical products using false shipping and product labels.

13. On March 5, 2011, defendant LIBBERT sent an electronic mail message to his wife, asking that she take a photograph of a "rust inhibitor" label in order for him to show it to defendant WU.

14. On March 10, 2011, in a series of electronic mail messages, defendant LIBBERT sent defendant WU photographs of false labels to be used in the packaging and shipping of chemical products.

15. On March 12, 2011, in an electronic mail message, defendant LIBBERT told defendant WU that the false labels and invoices were done, that he would be bringing them on his trip to China, and that he wanted to train defendant WU on how to package the chemical products properly.

16. On March 15, 2011, defendant LIBBERT traveled to Hong Kong, China, to deliver the labels and invoices to defendant WU.

17. On March 18, 2011, in a series of electronic mail messages, defendant LIBBERT sent defendant WU links where defendant WU could download false labels for use in packaging and shipping chemical products.

18. On April 9, 2011, in an electronic mail message, defendant LIBBERT asked an unindicted co-conspirator to send the false product labels defendant LIBBERT previously asked him to design.

19. On April 9, 2011, in an electronic mail message, an unindicted co-conspirator sent defendant LIBBERT a zip file containing product labels entitled, "The Original Rustopper," "Safepack," and "WUSHAWN."

20. On April 12, 2011, defendant LIBBERT and unindicted co-conspirator C.N. opened Wells Fargo account xxxx7292 ("Bank Account xxxx7292") in the name of "RCS Labs Inc."

21. On April 21, 2011, defendant LIBBERT opened a private mailbox at The UPS Store, located at 30251 Golden Lantern, Suite

1   E, Box #201 in Laguna Niguel, California, in the business name

2   of "Logistix" and the individual name of "Sean Libbert" (the

3   "Golden Lantern Mailbox").

4        22.  On May 17, 2011, defendant LIBBERT opened Wells Fargo

5   Bank account xxxx2854 ("Bank Account xxxx2854") in the name of

6   "RCS Labs, Inc.," with defendant LIBBERT as the sole signatory

7   on the account.

8        23.  On June 7, 2011, defendant LIBBERT opened a private

9   mailbox at the AIM Mail Center, located at 5319 University

10  Avenue, Box #201, in Irvine, California, in the business name of

11  "Organic Products LLC." and individual names of "Sean Libbert"

12  and "Kyle Kledzik" (the "University Avenue Mailbox").

13       24.  On June 16, 2011, defendant LIBBERT received a

14  shipment at the Via Pico Plaza Mailbox from an unindicted co-

15  conspirator labeled, "brightening agent," which actually

16  contained six grams of JWH-250.

17       25.  On June 22, 2011, defendant LIBBERT received a

18  shipment at the Via Pico Plaza Mailbox from an unindicted co-

19  conspirator declared as "Sample of Fitting" with a $15 value,

20  which actually contained 2,000 grams of AM-2201 valued in excess

21  of $10,000.

22       26.  On July 4, 2011, defendant LIBBERT received a shipment

23  at the Camino del Avion Mailbox from an unindicted co-

24  conspirator declared as "Gift Sample" with no dollar value,

25  which actually contained 2,000 grams of AM-694 valued in excess

26  of $8,000.

27       27.  On July 12, 2011, in an electronic mail message

28  concerning a package containing two kilograms of AM-694 that was

1  stuck in customs, defendant SIMON told defendant LIBBERT that

2  because defendant SIMON had not labeled the material or enclosed

3  any invoices/documents in the package, defendant LIBBERT could

4  either declare the correct product name "AM-694" or use the

5  false labels defendant LIBBERT had previously sent to defendant

6  SIMON.

7      28.  On July 12, 2011, in an electronic mail message,

8  defendant LIBBERT provided defendant SIMON with updated

9  inventory lists of the chemical products that he was keeping for

10  defendant SIMON's United States-based customers, chemical

11  products that defendant SIMON owed to defendant LIBBERT, and

12  chemical products that were in transit, and told defendant SIMON

13  that his products were selling well in the United States and

14  that defendant SIMON should send more AM-2201, JWH-203, and JWH-

15  210.

16      29.  On July 12, 2011, in an electronic e-mail message,

17  defendant LIBBERT told defendant SIMON that he had received a

18  new order from a customer for two kilograms of JWH-081, two

19  kilograms of JWH-210, four kilograms of AM-2201, and four

20  kilograms of AM-694; that he would be wiring payment the

21  following day to defendant SIMON; and that defendant SIMON

22  should send more AM-2201 and JWH-081 as soon as possible.

23      30.  On July 13, 2011, in an electronic mail message,

24  defendant SIMON thanked defendant LIBBERT for the new wire

25  transfer of money to pay for two kilograms of AM-2201.

26      31.  On July 13, 2011, in an electronic mail, defendant

27  SIMON told defendant LIBBERT that he sent one kilogram of JWH-

28  250 to be kept at defendant LIBBERT's warehouse and asked

1  defendant LIBBERT for the local price per kilogram for JWH-203

2  because defendant SIMON was going to make a new lot of JWH-203

3  if he could match that price.

4      32.  On July 13, 2011, in an electronic mail message,

5  defendant SIMON told defendant LIBBERT that he would make

6  approximately ten kilograms of JWH-203 that week and would send

7  five kilograms as soon as possible, that eight kilograms of AM-

8  2201 were on their way from Shanghai, that he would send

9  analogues on Friday with tracking numbers, and that he would

10 arrange for three kilograms of JWH-081 to be sent to defendant

11 LIBBERT.

12     33.  On July 13, 2011, in an electronic mail message,

13 defendant SIMON quoted defendant LIBBERT a new $4,200 per

14 kilogram price for AM-694, told defendant LIBBERT that he would

15 be sending four to five kilograms of the product the following

16 week, and instructed defendant LIBBERT to send him one or two

17 more new addresses for receiving parcels because he would be

18 sending six to ten parcels the following few days.

19     34.  On July 13, 2011, in an electronic mail message,

20 defendant SIMON informed defendant LIBBERT that he had sent one

21 kilogram of JWH-250 in a package labeled "Nox-Rust VCI Powder

22 1010SF-Industrial," which was a label defendant LIBBERT had

23 provided to defendant SIMON in June, and that defendant SIMON

24 had enclosed in the parcel a false invoice declaring a $5 value

25 for the package.

26     35.  On July 15, 2011, defendant LIBBERT received a

27 shipment at the Puerta Real Mailbox labeled "non-rust VCI powder

28 1010SF-Industrial," which actually contained 1,033 grams of JWH-

250.

36.   On July 22, 2011, defendant LIBBERT received a shipment at the University Drive Mailbox labeled "WUSHAWN Nox-Rust VCI Powder 1010SF - Industrial" and declared as "Sample of Fitting N.C.V.," which actually contained 2,000 grams of AM-694.

37.   On July 22, 2011, defendant LIBBERT received a shipment at the Camino del Avion Mailbox labeled, "WUSHAWN Nox-Rust VCI Powder 1010SF - Industrial" and declared as "Sample of paper N.C.U.," which actually contained 2,000 grams of AM-694.

38.   On August 17, 2011, defendant LIBBERT caused a wire transfer of $5,000 to be made from Bank Account xxxx7292 to Vista International Limited, one of defendant LIU's companies in China.

39.   On August 22, 2011, defendant LIBBERT received a shipment at the Camino del Avion Mailbox from an unindicted co-conspirator addressed to the alias "Sean Liberty" and containing 2,000 grams of AM-2201.

40.   On October 9, 2011, in an electronic mail message, defendant SIMON informed defendant LIBBERT that he had sent two packages to defendant LIBBERT, one containing one kilogram of A-796,260 that was labeled "Metal Corrosion Inhibitor," with an invoice declaring a $30 value for the package, and one package containing one kilogram of JWH-250 that was labeled "Corrosion Resistant Coating - Industrial," with an invoice declaring a $50 value for the package.

41.   On October 20, 2011, in an electronic mail message, defendant LIBBERT requested updated pricing and an estimated time of delivery for certain chemical products, including 5-MeO-

1  DALT, and further informed defendant ZHANG that he recently

2  changed websites and the name of his business because he had

3  been questioned by United States Customs officials and had his

4  laptop seized while coming back from China.

5      42.  On October 20, 2011, in an electronic mail message,

6  defendant ZHANG advised defendant LIBBERT of his current

7  inventory, including the fact that he had 5-MeO-DALT, and told

8  defendant LIBBERT to apprize him of how much he needed.

9      43.  On October 21, 2011, defendant LIBBERT opened a

10 private mailbox at The UPS Store, located at 34145 Pacific Coast

11 Highway, in Dana Point, California, in the business name of

12 "Organix" ("the Pacific Coast Highway Mailbox").

13     44.  On October 21, 2011, defendant LIBBERT opened a

14 private mailbox at the AIM Mail Center, located at 32565 B

15 Golden Lantern, in Dana Point, California, in the business name

16 of "ProLab" and the individual name of "Sean Libbert" (the

17 "Second Golden Lantern Mailbox").

18     45.  On October 23, 2011, in an electronic mail message,

19 defendant LIBBERT informed defendant LIU that he had sent a wire

20 transfer for $31,000 and had requested certain chemical products

21 to be sent using the New York port to three mailing addresses

22 that defendant LIBBERT provided for three alias companies,

23 "Organix, Inc.," "ProLab, Inc.," and "Logistix, Inc."

24     46.  On October 24, 2011, defendant LIBBERT caused a wire

25 transfer of $31,000 to be made from Bank Account xxxx7292 to

26 Vista International Limited, one of defendant LIU's companies in

27 China.

28     47.  On October 26, 2011, using coded language in an

39

1  electronic mail message, defendant LIBBERT informed defendant

2  SIMON that defendant LIBBERT's company was the largest supplier

3  of controlled substance analogues in the United States, that he

4  was looking for a reliable supplier, and that he needed to know

5  what shipping agents defendant SIMON used.

6      48.  On October 26, 2011, using coded language in an

7  electronic mail message, defendant LIBBERT informed an

8  unidentified co-conspirator that he was the owner of

9  "researchchemicalsupplier now rcschemicals in the US," which was

10  the largest supplier of controlled substance analogues, that he

11  was looking for a reliable supplier, and that he needed several

12  specific chemical products, including 5-MeO-DALT.

13      49.  On October 26, 2011, in an electronic mail message,

14  defendant LIBBERT asked an unidentified co-conspirator about her

15  company's shipping process, including whether they send

16  unlabeled packages or they label a package as a "different

17  product with supporting documentation."

18      50.  On November 7, 2011, in an electronic mail message,

19  defendant LIBBERT requested an updated products list and to know

20  defendant ZHANG's availability.

21      51.  On November 7, 2011, in an electronic mail messages,

22  defendant ZHANG informed defendant LIBBERT of the chemical

23  products he had in stock.

24      52.  On November 7, 2011, in an electronic mail message,

25  defendant LIBBERT told an UCC that he needed 5-MeO-DALT, as well

26  as other chemical products, that his company was

27  "RCSChemicals.com," that he had spent over $2 million that year

28  in his dealings with a Chinese supplier, and that he was looking

1  for another reliable supplier.

2      53.  On November 10, 2011, defendant LIBBERT opened up a

3  private mailbox through NYmail.com with an address of 244 Fifth

4  Avenue, Suite 1048, in New York, New York (the "New York

5  Mailbox").

6      54.  On November 11, 2011, in an electronic mail message,

7  an unindicted conspirator responded to defendant LIBBERT's

8  inquiry for chemical products and informed him that they usually

9  labeled the chemical product as a "gift" or "other chemicals"

10  sent by courier.

11      55.  On November 11, 2011, in an electronic mail message,

12  defendant LIBBERT told an unindicted co-conspirator that the

13  packages had to be "mislabeled professionally with correct

14  paperwork" and that defendant LIBBERT had "paperwork" for him.

15      56.  On November 12, 2011, in an electronic mail message,

16  an unindicted co-conspirator told defendant LIBBERT that her

17  company uses a "commercial invoice," that it labels the chemical

18  products, "Titanium Dioxide or bromine," which they switched

19  "every few months," that it could ship up to 20 kilograms, and

20  that it normally shipped no less than five kilograms "because

21  small packages look conspicuous to customs."

22      57.  On December 1, 2011, co-conspirator Neil transferred

23  the Via Pico Plaza Mailbox to defendant LIBBERT.

24      58.  On December 1, 2011, defendant LIBBERT completed an

25  application for the Via Pico Mailbox in the business names of

26  "RCS Labs, RCS Labs Inc." and "RCS."

27      59.  On December 6, 2011, in an electronic mail message,

28  defendant ZHANG informed defendant LIBBERT that he had AM-1248

1  in stock.

2     60.  On December 18, 2011, in an electronic mail message,

3  defendant LIU informed defendant LIBBERT that he was going to

4  ship AM-2233 to defendant LIBBERT and asked that defendant

5  LIBBERT stock it in his warehouse.

6     61.  On January 13, 2012, in an electronic mail message,

7  defendant LIU sent defendant LIBBERT a price list for several

8  chemical products, including UR-144 and AM-1248.

9     62.  On January 18, 2012, in an electronic mail message,

10  defendant LIBBERT ordered from defendant LIU chemical products,

11  including one kilogram of UR-144.

12     63.  On January 31, 2012, defendant LIBBERT opened Wells

13  Fargo Bank account xxxx5232 ("Bank Account xxxx5232") in the

14  name of "RCS Labs, Inc.," with defendant LIBBERT listed as the

15  sole signatory on the account.

16     64.  On February 1, 2012, in an electronic mail message,

17  defendant LIU sent defendant LIBBERT a diagram of the chemical

18  structure of a new product he and his company had manufactured

19  and which he was planning to call "PB-2."

20     65.  On February 3, 2012, in an electronic mail message,

21  defendant LIBBERT sent defendant LIU three private mailbox

22  addresses in Orange County, California, and three alias company

23  names for the purpose of having defendant LIU use this

24  information to send chemical products to defendant LIBBERT.

25     66.  On February 3, 2012, defendant LIBBERT caused a wire

26  transfer of $10,000 to be made from Bank Account xx7292 to Vista

27  International Limited, one of defendant LIU's companies in

28  China.

67. On February 5, 2012, in an electronic mail message, defendant LIU sent defendant LIBBERT tracking numbers for packages destined for the private mailbox addresses previously sent by defendant LIBBERT containing two kilograms of UR-144 and one kilogram of the chemical product PB-2.

68. On February 9, 2012, in an electronic mail message, defendant LIU sent defendant LIBBERT three corrected tracking numbers for packages separately sent to the three private mailbox addresses and the status of each package.

69. On February 27, 2012, defendant LIBBERT caused a wire transfer of $6,000 to be made from Bank Account xx5232 to Vista International Limited, one of defendant LIU's companies in China.

70. On February 27, 2012, in an electronic mail message, defendant LIBBERT informed defendant LIU that he had sent a wire transfer of $6,000 to pay for the four kilograms of chemical products he had received at the unit pricing of $4,000 per kilogram because one of the three separate shipments had been seized by United States Customs officials.

71. On March 6, 2012, in an electronic mail message, defendant LIBBERT complained to defendant LIU that he was afraid to do business with defendant LIU because defendant LIU was sending "unlabeled products" or packages labeled "white powder," urged defendant LIU to "be creative, use labels with logos, use invoices, inserts, MSDS, etc.," and asked defendant LIU why he did not use the labels and invoices defendant LIBBERT had given him or similar paperwork.

72. On March 7, 2012, in an electronic mail message,

43

defendant LIU sent defendant LIBBERT sample false labels with the product name "Titanium Dioxide," and asked defendant LIBBERT which ones he preferred.

73.   On March 7, 2012, in an electronic mail message, defendant LIBBERT told defendant LIU that he liked the labels sent by defendant LIU but that they could not say "25kg" and that the packages should include a sticker with a logo and paperwork like Material Safety Data Sheets.

COUNT SIX

[18 U.S.C. § 922(g)(1)]

On or about July 25, 2012, in Orange County, within the Central District of California, defendant SEAN LIBBERT knowingly possessed firearms, namely:

(1)   a .223 caliber CMMG AR-15 style rifle, Model #MOD4SA, bearing serial number #SA11381;

(2)   a Benelli 12 gauge shotgun, Model Super90, bearing serial number #M436568;

(3)   a Smith & Wesson M&P 9mm pistol, bearing serial number #DTZ6377; and

(4)   a Smith & Wesson M&P 45 caliber pistol, bearing serial number DTB7568,

and ammunition, namely:

(1)   200 rounds of .223 Remington caliber ammunition with headstamps reading "WOLF";

(2)   360 rounds of .223 Remington caliber with headstamps reading "PMC";

(3)   21 rounds of 5.56mm caliber ammunition with headstamps reading "LC";

(4)   35 rounds of Federal brand 12 gauge ammunition;

(5)   Nine rounds of Wolf brand 12 gauge ammunition with headstamps reading "GLOBALSHOT.COM";

(6)   Five rounds of Wolf brand 12 gauge ammunition with headstamps reading "SCHONEBECK";

(7)   49 rounds of 9mm Luger caliber ammunition with headstamps reading "R-P"; and

(8)   20 rounds of .45 Automatic caliber ammunition with

1    headstamps reading "CBC,"

2    each in and affecting interstate and foreign commerce.

3         Such possession occurred after defendant LIBBERT had been

4    convicted of the following felonies, each punishable by a term

5    of imprisonment exceeding one year, namely:

6         1.   First Degree Burglary, in violation of California

7    Penal Code Section 459, in the Superior Court of the State of

8    California, County of San Diego, case number CN044350, on or

9    about August 13, 1996;

10        2.   Grand Theft: Money/Labor/Property, in violation of

11   California Penal Code Section 487(A), in the Superior Court of

12   the State of California, County of San Diego, case number

13   CN044350, on or about August 13, 1996; and

14        3.   Conspiracy to Distribute a Controlled Substance, in

15   violation of Title 21, United States Code, Sections 846,

16   841(a)(1), in the Southern District of California, case number

17   02CR1971-W, on or about December 30, 2002.

18

19

20

21

22

23

24

25

26

27

28

COUNTS SEVEN through TWELVE

[18 U.S.C. §§ 1956(a)(1)(A)(i), 2]

On or about the following dates, in Orange County, within the Central District of California, and elsewhere, defendant SEAN LIBBERT knowingly and intentionally conducted, attempted to conduct, and aided, abetted, counseled, commanded, induced and procured the following financial transactions affecting interstate and foreign commerce, knowing that the property involved in each of the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, the unlawful manufacture and distribution of controlled substance analogues, in violation of 21 U.S.C. § 841(a)(1), with the intent to promote the carrying on of said specified unlawful activity:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| SEVEN | 7/14/2011 | Transfer of $26,500 from defendant LIBBERT's Wells Fargo Bank Account xxxx7292 ("Bank Account xxxx7292") |
| EIGHT | 7/27/2011 | Transfer of $21,000 from Bank Account xxxx7292 |
| NINE | 12/6/2011 | Transfer of $16,000 from Bank Account xxxx7292 |
| TEN | 1/17/2012 | Transfer of $17,500 from Bank Account xxxx7292 |
| ELEVEN | 3/13/2012 | Transfer of $20,000 from defendant LIBBERT's Wells Fargo Bank Account xxxx5232 ("Bank Account xxxx5232") |
| TWELVE | 5/17/2012 | Transfer of $12,000 from defendant Bank Account xxxx5232 |

1          COUNTS THIRTEEN through SIXTEEN

2              [18 U.S.C. §§ 1957(a), 2]

3       On or about the following dates, in Orange County, within

4   the Central District of California, defendant SEAN LIBBERT

5   knowingly and intentionally engaged in, attempted to engage in,

6   and aided, abetted, counseled, commanded, induced, and procured

7   the following monetary transactions greater than $10,000 and

8   affecting interstate commerce, knowing that the property

9   involved in each of the monetary transactions represented the

10  proceeds of specified unlawful activity, that is, the unlawful

11  manufacture and distribution of controlled substance analogues,

12  in violation of 21 U.S.C. § 841(a)(1):

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|----------------------|
| THIRTEEN | 5/9/2011 | Transfer of $75,000 from defendant LIBBERT's Wells Fargo Bank Account xxxx7292 ("Bank Account xxxx7292") |
| FOURTEEN | 9/1/2011 | Transfer of $46,551 from Bank Account xxxx7292 |
| FIFTEEN | 10/24/2011 | Transfer of $141,905.08 from defendant LIBBERT's Wells Fargo Bank Account xxxx7074 |
| SIXTEEN | 10/24/2011 | Transfer of $141,905.07 from defendant LIBBERT's Wells Fargo Bank Account xxxx4709 |

CRIMINAL FORFEITURE ALLEGATION ONE

[21 U.S.C. § 853]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 853(a), in the event of any defendant's conviction under any of Counts One through Four of this Indictment.   Each defendant convicted of any of the offenses set forth in Counts One through Four shall forfeit to the United States the following property:

    (a)   All right, title, and interest in --

        (i)   any and all property constituting or derived from any proceeds obtained, directly or indirectly, as a result of each such violation; and

        (ii)  any property, real or personal, used, or intended to be used, in any manner or part, to commit or to facilitate the commission of each such violation.

    (b)   A sum of money equal to the total value of the property described in paragraphs 1(a)(i) and (ii).

2.    Pursuant to Title 21, United States Code, Section 853(p), each defendant so convicted shall forfeit substitute property, up to the value of the total amount described in paragraph 1(a) if, as the result of any act or omission of said defendant, said property, or any portion thereof, cannot be located upon the exercise of due diligence; has been

transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

CRIMINAL FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(2)(B)]

1.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(2)(B), in the event of any defendant's conviction under Count Five of this Indictment. Each defendant convicted of any of the offenses set forth in Count Five shall forfeit to the United States all right, title, and interest in any and all property constituting or derived from any proceeds obtained, directly or indirectly, as a result of such violation.

2.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated at Title 18, United States Code, Section 982(b)(1), each defendant so convicted shall forfeit substitute property, up to the value of the total amount described in paragraph 1 if, as the result of any act or omission of said defendant, said property, or any portion thereof, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

CRIMINAL FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982(a)(1)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal
Procedure, notice is hereby given to the defendants that the
United States will seek forfeiture as part of any sentence in
accordance with Title 18, United States Code, Section 982(a)(1),
in the event of any defendant's conviction under any of Counts
Seven through Sixteen of this Indictment.   Each defendant
convicted of each offense set forth in Counts Seven through
Sixteen shall forfeit to the United States --

           (a)   any property, real or personal, involved in such
                 offense, or any property traceable to such
                 property, including --
                 (i)   any and all property constituting or derived
                     from any proceeds obtained, directly or
                     indirectly, as a result of each such
                     violation; and
                 (ii)  any property, real or personal, used or
                     intended to be used, in any manner or part,
                     to commit or to facilitate the commission of
                     each such violation.
           (b)   A sum of money equal to the total value of the
                 property described in paragraphs 1(a)(i) and
                 (ii).

2.    Pursuant to Title 21, United States Code, Section
853(p), as incorporated at Title 18, United States Code, Section
982(b)(1), each defendant so convicted shall forfeit substitute
property, up to the value of the total amount described in

1  paragraph 1(a) if, as the result of any act or omission of said

2  defendant, said property, or any portion thereof, cannot be

3  located upon the exercise of due diligence, has been

4  transferred, sold to, or deposited with a third party; has been

5  placed beyond the jurisdiction of the court; has been

6  substantially diminished in value; or has been commingled with

7  other property that cannot be divided without difficulty.

8

9                                    A TRUE BILL

10

11                           /s/
                        _____
                        Foreperson

12

13  ANDRÉ BIROTTE JR.
    United States Attorney

14

15

16  ROBERT E. DUGDALE
    Assistant United States Attorney
17  Chief, Criminal Division

18  KEVIN M. LALLY
    Assistant United States Attorney
19  Chief, OCDETF Section

20  RASHA GERGES SHIELDS
    Assistant United States Attorney
21  Deputy Chief, OCDETF Section

22  CAROL A. CHEN
    Assistant United States Attorney
23  OCDETF Section

24

25

26

27

28